RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0214p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JOY SPURR,

    Plaintiff - Appellant,

    v.

MELISSA LOPEZ POPE, Chief Judge of Tribal Court of Nottawaseppi Huron Band of the Potawatomi; SUPREME COURT FOR THE NOTTAWASEPPI HURON BAND OF POTAWATOMI; NOTTAWASEPPI HURON BAND OF THE POTAWATOMI,

                *Defendants-Appellees*.

> No. 18-2174

———————————

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:17-cv-01083—Janet T. Neff, District Judge.

Argued:  May 1, 2019

Decided and Filed:  August 26, 2019

Before:  DAUGHTREY, COOK, and GRIFFIN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**  Stephen J. Spurr, Grosse Pointe Park, Michigan, for Appellant.  David A. Giampetroni, KANJI & KATZEN, PLLC, Ann Arbor, Michigan, for Appellees.  **ON BRIEF:** Stephen J. Spurr, Grosse Pointe Park, Michigan, for Appellant.  David A. Giampetroni, KANJI & KATZEN, PLLC, Ann Arbor, Michigan, William Brooks, NOTTAWASEPPI HURON BAND OF THE POTAWATOMI, Fulton, Michigan, for Appellees.

---

**OPINION**

---

COOK, Circuit Judge.  Most family spats end long before a court gets involved.  This one did not, however, and an Indian tribal court eventually issued a protection order against Joy Spurr, the stepmother of a tribal member.  But our review involves no probing of the facts, just a pure question of law: Does a tribal court have jurisdiction under federal law to issue a civil personal protection order against a non-Indian and non-tribal member in matters arising in the Indian country of the Indian tribe?  Because 18 U.S.C. § 2265(e) unambiguously grants tribal courts that power, and because tribal sovereign immunity requires us to dismiss this suit against two of the named defendants, we AFFIRM the district court's dismissal of Spurr's complaint.

**I.**

Joy Spurr is the stepmother of Nathaniel Spurr, a tribal member of the Nottawaseppi Huron Band of the Potawatomi (NHBP), a federally recognized, sovereign Indian tribe located in Fulton, Michigan.  Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 83 Fed. Reg. 34863 (July 23, 2018).  In February 2017, Nathaniel sought an ex parte personal protection order (PPO) from the NHBP tribal court, alleging that Spurr engaged in a campaign of harassment against him that included, among many other things, unwanted visits to Nathaniel's residence on the NHBP reservation and several hundred letters, emails, and phone calls.  R. 22-3, PageID 268–81.  The tribal court issued the ex parte PPO.

That same month, the tribal court held a hearing to determine whether to make the PPO "permanent"—in other words, to make it last one year.  After considering witness testimony, other evidence, and the parties' arguments, the tribal court issued a permanent PPO against Spurr.  This PPO swept broadly, prohibiting Spurr from contacting Nathaniel or "appearing within [his] sight."  R. 1-3, PageID 31.  The court later denied Spurr's motion to reconsider or modify that order in a thorough, thirty-six-page opinion.  On appeal, the NHBP Supreme Court affirmed, holding that tribal law authorizes the tribal court to issue civil personal protection

orders against "a non-Indian who resides outside of the boundaries of Nottawaseppi Huron Band Indian country."

About six months later, Nathaniel again initiated proceedings in tribal court, claiming that Spurr violated the PPO. After holding two hearings (Spurr did not attend the first) where the parties presented evidence and testimony, the tribal court found Spurr "in civil contempt for violating the [PPO], a civil personal protection order." R. 22-4, PageID 283–84. The tribal court mandated that Spurr pay (1) the attorney's fees incurred by Nathaniel for the hearing where Spurr failed to appear; and (2) $250 to NHBP for the "costs . . . associated with holding the hearing." R. 22-4, PageID 284. In lieu of the $250 payment, Spurr could choose to perform twenty-five hours of community service.

After Nathaniel alleged that Spurr violated the PPO—but before either hearing—Spurr went on the offensive. In federal district court, she sued (1) Melissa L. Pope, the Chief Judge of the NHBP Tribal Court (who issued the PPO), (2) the NHBP Supreme Court (that affirmed), and (3) the Band (a sovereign Indian tribe), seeking a declaratory judgment and injunctive relief. In an order denying Spurr's request for a preliminary injunction, the court limited the parties' motion-to-dismiss briefing to two issues: sovereign immunity and subject-matter jurisdiction. In its joint motion to dismiss, the Tribal defendants argued that Spurr's claims against the Band and the NHBP Supreme Court were barred by sovereign immunity and should be dismissed under Federal Rule of Civil Procedure 12(b)(1). R. 30, PageID 354.

The district court held that, under 28 U.S.C. § 1331, it had federal question jurisdiction to review Spurr's claim that the tribal court "lacked jurisdiction to issue the PPO as a matter of federal law." R. 33, PageID 396–98. But the court ultimately found that 18 U.S.C. § 2265 established the tribal court's jurisdiction and dismissed under Rule 12(b)(6) Spurr's jurisdictional challenge without addressing the sovereign immunity issue. Spurr appealed.[1]

---

[1]On February 14, 2019, after a hearing, the tribal court reissued its PPO against Spurr. R. 39, Ex. 3.

**II.**

We review de novo a motion to dismiss under Rule 12(b)(1) and Rule 12(b)(6).  *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 572 (6th Cir. 2008); *Hedgepeth v. Tennessee*, 215 F.3d 608, 611 (6th Cir. 2000).  "When [a] defendant challenges subject matter jurisdiction through a motion to dismiss, the plaintiff bears the burden of establishing jurisdiction."  *Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002) (citation omitted).  We must consider the Rule 12(b)(1) challenge first; if this court lacks subject matter jurisdiction, the Rule 12(b)(6) motion becomes moot.  *See Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990); *Bell v. Hood*, 327 U.S. 678, 682 (1946).

**III.**

Spurr's briefs present a cornucopia of grievances—some reference the Constitution, others the emotional and financial burden of this litigation.  But as her opening brief posits, this case involves "a single issue of law": Did the NHBP tribal court have jurisdiction under federal law to issue this personal protection order against her, a non-Indian and non-tribal member? After first resolving the threshold issue of tribal sovereign immunity, we hold that it did.

**A.  Tribal Sovereign Immunity**

The district court determined that it had federal question jurisdiction over the claims raised, so it needn't address the issue of tribal sovereign immunity.  But tribal sovereign immunity is a jurisdictional doctrine.  That means we must address it—and must do so first.  If it shields the tribe, we have the power to say that (and only that) and to dismiss the claim for lack of subject-matter jurisdiction.  *Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc.*, 585 F.3d 917, 919–20 (6th Cir. 2009) ("[I]f [the tribe] enjoys tribal-sovereign immunity, we need not address the issues of diversity jurisdiction and federal-question jurisdiction.").  The Band explicitly waived sovereign immunity on appeal as to Chief Judge Pope, but asserts that sovereign immunity deprives us of jurisdiction to consider the claims against the other two tribal defendants.  We agree.  Tribal sovereign immunity bars this suit against the Band and the NHBP Supreme Court.  *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 790–91 (2014).

"Indian tribes are 'domestic dependent nations' that exercise 'inherent sovereign authority.'" *Id.* at 788 (citations omitted). That sovereignty includes "common-law immunity from suit traditionally enjoyed by sovereign powers." *Id.* (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)). It shields not only an Indian tribe itself, but also "arms of the tribe" acting on its behalf. *Memphis Biofuels*, 585 F.3d at 921; *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754–55 (1998) (recognizing that the Court has not "yet drawn a distinction between governmental and commercial activities of a tribe"). As the Supreme Court recently reminded us, the baseline rule "is tribal immunity." *Bay Mills*, 572 U.S. at 790.

But the Constitution grants Congress plenary control over tribes, and thus the power to abrogate tribal sovereign immunity. *Id.*; *United States v. Lara*, 541 U.S. 193, 200 (2004). To do so, "Congress must 'unequivocally' express that purpose." *C & L Enters., Inc. v. Citizen Band Potawatomi Tribe of Okla.*, 532 U.S. 411, 418 (2001) (quoting *Santa Clara Pueblo*, 436 U.S. at 58); *Bay Mills*, 572 U.S. at 790. Indeed, Indian tribes remain separate sovereigns that pre-existed the Constitution, and "courts will not lightly assume that Congress in fact intends to undermine Indian self-government." *Bay Mills*, 572 U.S. at 790. "Thus, unless and 'until Congress acts, the tribes retain' their historic sovereign authority." *Id.* at 788 (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978)).

To support her view that Congress unequivocally expressed the purpose to subject the Band to this suit, Spurr points to 28 U.S.C. § 1331. That statute reads: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Spurr reasons that by granting district courts the authority to hear such actions, Congress authorized suits against an Indian tribal court exercising federally-derived authority. But § 1331's text fails to abrogate tribal sovereign immunity. To upset the baseline rule of tribal immunity, the statute's text "must 'unequivocally' express that purpose"—shout it, not whisper it. *Bay Mills*, 572 U.S. at 790 (citation omitted). Yet § 1331 never hints at jurisdiction over suits against separate nations, the status recognized tribes hold. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says

there."). Thus, we cannot say that § 1331 reflects Congress's unmistakably clear intention to abrogate tribal sovereign immunity. *See Dellmuth v. Muth*, 491 U.S. 223, 227–28 (1989).

Beyond the text of § 1331, our precedent interpreting it also leans this direction. In the context of the United States' sovereign immunity, we have held that § 1331 "is not a general waiver of sovereign immunity; it merely establishes a subject matter that is within the competence of federal courts to entertain." *Whittle v. United States*, 7 F.3d 1259, 1262 (6th Cir. 1993); *see Reed v. Reno*, 146 F.3d 392, 397–98 (6th Cir. 1998) ("Section 1331's general grant of federal question jurisdiction, however, 'does not by its own terms waive sovereign immunity and vest in district courts plenary jurisdiction' over claims for money judgments against the United States." (citation omitted)). And "[t]ribal sovereign immunity is deemed to be coextensive with the sovereign immunity of the United States." *Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1011 (10th Cir. 2007); *see Bay Mills*, 572 U.S. at 789 (citing *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512 (1940)). It therefore follows that § 1331 "is not a general waiver" of tribal sovereign immunity. *See Whittle*, 7 F.3d at 1262.

Indeed, the Tenth Circuit rejects this same argument. In *Miner Electric*, plaintiffs sought declaratory and injunctive relief related to a forfeiture order issued by the Nation's tribal court, arguing that the court did not have jurisdiction over them. 505 F.3d at 1008. The Nation moved to dismiss the complaint on sovereign immunity grounds, and the district court denied the motion, reasoning that it had "the authority [under § 1331] to determine whether a tribal court had the power to exercise civil subject matter jurisdiction over a non-Indian's property rights." *Id.* at 1009, 1011. The Tenth Circuit reversed and remanded for dismissal under Fed. R. Civ. P. 12(b)(1), holding that "federal-question jurisdiction [does not] negate[] an Indian tribe's immunity from suit" because "nothing in § 1331 unequivocally abrogates tribal sovereign immunity." *Id.* at 1011.

The district court here, in implicitly reasoning otherwise, cited *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985), specifically the Court's statement that "[t]he question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a 'federal question' under § 1331." *Id.* at 852. That reasoning,

however, answers a different question that the parties here do not dispute: whether this case presents a federal question. That is, § 1331 concerns whether the court has jurisdiction over the *claims* raised. But "[t]he fact that Congress grants *jurisdiction* to hear a claim does not suffice to show Congress has abrogated all *defenses* to that claim." *Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 786 n.4 (1991); *Whittle*, 7 F.3d at 1262.

The Court in *National Farmers* went no further, resolving that petitioners needed to first exhaust their tribal court remedies before a federal court could entertain the claim. *See El Paso Natural Gas. Co. v. Neztsosie*, 526 U.S. 473, 478 (1999) (explaining that *National Farmers* announced the "tribal-court exhaustion" rule). In fact, the Supreme Court has expressed doubt that § 1331 abrogates sovereign immunity, holding in *Blatchford* that 28 U.S.C. § 1362—which grants district courts original jurisdiction over "all civil actions, brought by any Indian tribe or band . . . aris[ing] under the Constitution, laws, or treaties of the United States"—does not reflect an "unmistakably clear" intent to abrogate state sovereign immunity in suits brought against States by Indian tribes. 501 U.S. at 786. In so holding, it reasoned that § 1362's "text is no more specific than § 1331 . . . , and no one contends that § 1331 suffices to abrogate immunity for all federal questions." *Id.*

We reject Spurr's reliance on § 1331 as supporting this court's exercising subject-matter jurisdiction here and hold that tribal sovereign immunity bars the claims against the Band and the NHBP Supreme Court. *See Miner*, 505 F.3d at 1011. The district court thus erred by denying the motion to dismiss those claims for lack of subject-matter jurisdiction. We affirm dismissal on sovereign immunity grounds. *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 435 (6th Cir. 2016) ("This court may affirm on any grounds supported by the record, even those not relied on by the district court.").

**B. The Source of Tribal Jurisdiction**

Having dispensed with Spurr's claims against the Band and NHBP, only the claims against Chief Judge Pope remain. The Band explicitly waived sovereign immunity as to the Chief Judge, so we finally get to the meaty question of whether federal law vests the NHBP tribal court with jurisdiction to issue this personal protection order against Spurr.

Indian tribes have the "right to make their own laws and be governed by them." *Nevada v. Hicks*, 533 U.S. 353, 361 (2001). This inherent sovereign authority includes the power to determine tribal membership, regulate relations among its members, and punish tribal offenders. *Id.* But this authority generally "do[es] not extend to the activities of nonmembers of the tribe." *Montana v. United States*, 450 U.S. 544, 565 (1981); *Hicks*, 533 U.S. at 359. When it comes to non-Indians and nonmembers, the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Montana*, 450 U.S. at 564; *see South Dakota v. Bourland*, 508 U.S. 679, 695 n.15 (1993). Thus, to exercise tribal authority over nonmembers, an Indian tribe must point to one of two sources of power: its inherent sovereign authority or an Act of Congress. *Hicks*, 533 U.S. at 360; *Strate v. A-1 Contractors*, 520 U.S. 438, 445–46 (1997).

The parties argue only the second source, focusing their arguments on different statutes, both enacted as part of the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54 (2013). The Band argues that 18 U.S.C. § 2265(e) expressly grants tribal courts the power to issue civil PPOs against *any person*, a category of persons that, of course, includes a non-Indian, nonmember like Spurr. Spurr counters that a different statute, 25 U.S.C. § 1304, governs this tribal action and grants tribal courts jurisdiction to issue PPOs only against *some* non-Indians and nonmembers—those with specific ties to the tribe (of which she has none). The district court agreed with the Band, and so do we.

"A matter requiring statutory interpretation is a question of law requiring de novo review, and the starting point for interpretation is the language of the statute itself." *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1059 (6th Cir. 2014) (quoting *Roberts v. Hamer*, 655 F.3d 578, 582 (6th Cir. 2011)). If the text makes clear the statute's meaning, we go no further. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003); *see Caminetti v. United States*, 242 U.S. 470, 485, 490 (1917) ("[T]he sole function of the courts is to enforce [the law] according to its terms . . . . [I]t is neither the duty nor the privilege of the courts to enter speculative fields in search of a different meaning.").

**1. 18 U.S.C. § 2265(e)**

As argued by the Band, § 2265(e) unambiguously grants tribal courts the power exercised by the NHBP tribal court here. It reads:

> **(e) Tribal court jurisdiction.**--For purposes of this section, a court of an Indian tribe shall have *full civil jurisdiction* to issue and enforce protection orders involving *any person*, including the authority to enforce any orders through civil contempt proceedings, to exclude violators from Indian land, and to use other appropriate mechanisms, in matters arising anywhere in the Indian country of the Indian tribe (as defined in section 1151) or otherwise within the authority of the Indian tribe.

18 U.S.C. § 2265(e) (emphasis added). This text authorizes Indian tribal courts to issue and enforce *civil* protection orders against *any person*—Indian or non-Indian, tribal member or non-tribal member—in matters arising in the Indian country of an Indian tribe.[2] Spurr of course cannot contest that the NHBP tribal court is "a court of an Indian tribe," her fit within the category of "any person," or that this matter arises in the Indian country of the Band.

But Spurr *does* dispute whether this PPO is a civil protection order. She suggests that the tribal court here issued a *criminal* protection order, an action not authorized by § 2265(e), citing NHBP law, the PPO's language, its "severe restrictions on [her] freedom of movement and communication," and the penalties for violating it. Her arguments referencing the PPO's language and NHBP law unavoidably run together and, as the NHBP Supreme Court noted, NHBP law "perhaps could be made clearer." R. 22-2, PageID 258.

The NHBP Code authorizes a tribal court to issue a "civil protection order," NHBP Code § 7.4-49, on behalf of "any person claiming to be the victim of . . . stalking," NHBP Code § 7.4-50. And the Code also states that "[t]his article is intended to provide victims [of harassment] with a speedy and inexpensive method of obtaining *civil harassment protection*

---

[2]This express delegation of authority to tribes obviates Spurr's suggestion that a tribe also must meet one of the two *Montana* exceptions. *See* 540 U.S. at 564; *Cty. of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 237 (1985) ("[F]ederal common law is used . . . when Congress has not 'spoken to a *particular* issue.'" (quotation omitted)); *Thlopthlocco Tribal Town v. Stidham*, 762 F.3d 1226, 1234 (10th Cir. 2014) (describing *Montana* as "federal common law").

*orders* preventing all further unwanted contact between the victim and the perpetrator."  NHBP Code § 7.4-71 (emphasis added).

In granting the PPO, titled "Personal Protection Order (Non-Domestic) (Stalking)," the tribal court found that Spurr engaged in "conduct prohibited under the [NHBP] Domestic Violence Code."  R. 1-3, PageID 31.  And the PPO's text states that Nathaniel's petition "has been filed and is enforceable under the authority of . . . 18 U.S.C. § 2265," R. 1-3, PageID 31, a statute that authorizes tribal courts to issue only *civil* protection orders.  But Spurr seizes on language in the tribal court's opinion refusing to reconsider or modify its order that refers to the PPO as a "Permanent Harassment Protection Order," which rests under the heading of "Criminal Protection Orders."  NHBP Code § 7.4-72, 73.  She also points to NHBP law, which defines "stalking" as a crime in § 7.4-42(a) of the Domestic Violence Code.

On appeal, after wrestling with this inartful drafting and Spurr's arguments, the NHBP Supreme Court held that the Tribal Code authorizes tribal courts to issue civil PPOs for stalking or harassment, which includes the PPO issued here.  R. 22-2, PageID 258–59.  And "[o]rdinarily, we defer to tribal court interpretations of tribal law 'because tribal courts are best qualified to interpret and apply tribal law.'"  *Kelsey v. Pope*, 809 F.3d 849, 864 (6th Cir. 2016) (quoting *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 (1987)).

But even without this decision from the Band's highest court, Spurr's argument falls short.  The tribal court's decision to issue the PPO explicitly to prohibit stalking supports the conclusion that the court issued a *civil* PPO on behalf of a "victim of . . . stalking," NHBP Code § 7.4-50.  So does its express statement that the petition was filed and enforceable under § 2265.  R. 1-3, PageID 31.  And though the Domestic Violence Code does list "stalking" as a crime, NHBP law explicitly authorizes a tribal court to issue a "*civil* protection order" on the behalf of a "victim of . . . stalking."  NHBP Code § 7.4-49, 50.

That leaves us with Spurr's contention that the penalties for violating the PPO and its restrictions on her "freedom of movement and communication" make it criminal in nature.  The PPO states that "[v]iolation of this order subjects [Spurr] to immediate arrest and to the civil and criminal contempt powers of the court.  If found guilty, the respondent shall be imprisoned for

not more than 90 days and/or may be fined not more than $1,000.00." R. 1-3, PageID 31. But the fact that Spurr faces criminal contempt or imprisonment *if* she violates this PPO fails to change the nature of the order. *See United States v. Bayshore Assocs., Inc.*, 934 F.2d 1391, 1400 (6th Cir. 1991) ("Incarceration has long been established as an appropriate sanction for civil contempt."); *Smith v. Leis*, 407 F. App'x 918, 920 (6th Cir. 2011) (noting that the Sheriff's Office arrested the defendant for "violating the terms of a civil protection order"). The same goes for its restrictions on her movement and communication. *See Morrison v. Warren*, 375 F.3d 468, 470 (6th Cir. 2004) (civil protection order issued against husband for allegations of domestic abuse prohibited him "from possessing, using, carrying, or obtaining any deadly weapon for up to five years"); *Kelm v. Hyatt*, 44 F.3d 415, 417–18 (6th Cir. 1995) (domestic violence victim sought and obtained a civil protection order requiring her husband to "vacate the marital residence").

The Band notes that it modeled its civil PPO's language after the Michigan statute authorizing a state court to issue civil PPOs under state law for stalking. The Band even went so far as to copy Michigan's list of restricted conduct. *Compare* R. 1-3 ¶ 5, PageID 31, *with* Mich. Comp. Laws § 600.2950a(3). Moreover, it flags that the tribal court ultimately issued "civil contempt" sanctions (in the form of attorney's fees) for Spurr's violation of the court's order, not any criminal penalties. *See McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 634 (6th Cir. 2000) ("[A]n award of attorney's fees is appropriate for civil contempt in situations where court orders have been violated."). For all those reasons, we disagree with Spurr: The tribal court issued a civil protection order against her.

Spurr also presses a contextual argument that fares no better. She argues that § 2265's title—"Full faith and credit given to protection orders"—reveals that its provisions do not grant tribal courts the power to issue PPOs; rather, § 2265 provides full faith and credit for protection orders issued under statutes that *do* authorize issuing protection orders. But "the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Bhd. of R.R. Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528–29 (1947); *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998). That's especially true when § 2265(e)'s heading reads: "Tribal court jurisdiction."

Titles "are but tools available for the resolution of a doubt." *Bhd. of R.R. Trainmen*, 331 U.S. at 529.  Thus, "considering the title is not appropriate unless the statute is ambiguous." *United States v. Cain*, 583 F.3d 408, 416 (6th Cir. 2009).  And we find no ambiguity here. Section 2265 unequivocally states that tribal courts "shall have full civil jurisdiction to issue and enforce protection orders involving any person." § 2265(e).  Its title "cannot undo or limit" what the text makes plain. *Bhd. of R.R. Trainmen*, 331 U.S. at 529; *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 222 (2012) ("[A] title or heading should never be allowed to override the plain words of a text.").

## 2. 25 U.S.C. § 1304

That brings us to Spurr's argument that an entirely different statute, 25 U.S.C. § 1304, defeats the Band's reliance on 18 U.S.C. § 2265.  She argues that § 1304 grants tribal courts the power to issue criminal and civil PPOs, but only when the defendant has specific ties to the tribe. Section 1304 provides participating tribes "special domestic violence criminal jurisdiction over a defendant for criminal conduct that falls into one or more of the following categories": (1) domestic violence and dating violence; or (2) violations of protection orders.  25 U.S.C. § 1304(c).  For defendants lacking ties to the Indian tribe, § 1304(b)(4)(B) authorizes the exercise of this "special domestic violence criminal jurisdiction" only when a defendant:

> (i) resides in the Indian country of the participating tribe;
> (ii) is employed in the Indian country of the participating tribe; or
> (iii) is a spouse, intimate partner, or dating partner of—
> > (I) a member of the participating tribe; or
> > (II) an Indian who resides in the Indian country of the participating tribe.

Spurr argues that, because she meets none of these criteria, the tribal court had no authority to issue the PPO against her.

But the tribal court did not exercise its "special domestic violence jurisdiction."  Not one of § 1304's jurisdictional hooks—domestic violence or dating violence or violations of protection orders—were satisfied.  25 U.S.C. § 1304(c).  As defined by the statute, Spurr did not engage in acts of dating or domestic violence.  § 1304(a)(1)-(2); R. 33, PageID 399.  Nor did the tribal court exercise jurisdiction over Spurr for the *violation* of a protection order.

§ 1304(c)(2)(B). Rather, as discussed above, the tribal court exercised *civil* jurisdiction to issue a *civil* PPO for stalking.

Spurr insists that § 1304(a)(5) supports her stance, but it does not. That section defines "protection order" to:

> (A) mean[] any injunction, restraining order, or other order *issued* by a civil or criminal court for the purpose of preventing violent or threatening acts or harassment against, sexual violence against, contact or communication with, or physical proximity to, another person; and
>
> (B) include[] any temporary or final order *issued* by a civil or criminal court . . . if the civil or criminal order was issued in response to a complaint, petition, or motion filed by or on behalf of a person seeking protection.

25 U.S.C. § 1304(a)(5) (emphasis added). This language speaks of already-issued PPOs, however, such that the PPO could have been violated—one of the statute's jurisdictional hooks. § 1304(c)(2). In other words, § 1304(a)(5) defines the types of protection orders that—if violated—authorize a tribal court to exercise its "special domestic violence criminal jurisdiction." That section does not authorize tribal courts to issue PPOs—whether civil or criminal—in the first instance. As the district court correctly put it, this statute and 18 U.S.C. § 2265(e) "govern two different subject areas." R. 33, PageID 399.

\* \* \*

Because 18 U.S.C. § 2265(e) grants Indian tribal courts the power to issue civil protection orders against any person in matters arising in the Indian country of the Indian tribe, we uphold the issuance of this civil PPO against Spurr as valid, affirming dismissal of the claims against the Band and the NHBP Supreme Court on sovereign immunity grounds.

## IV. CONCLUSION

We AFFIRM the district court's judgment.