RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0221p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

T.M., Next Friend on behalf of H.C. and Y.C., et al.,
          *Plaintiffs-Appellants*,

          *v.*

RICHARD MICHAEL DEWINE, et al.,
          *Defendants-Appellees*.

⎤
⎟
⎟
⎟
⎟
>  No. 21-3752
⎟
⎟
⎟
⎦

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:20-cv-00944—Michael R. Barrett, District Judge.

Argued:  June 7, 2022

Decided and Filed:  September 28, 2022

Before:  McKEAGUE, NALBANDIAN, and READLER, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Paul B. Lewis, DLA PIPER LLP (US), Boston, Massachusetts, for Appellants. Mathura J. Sridharan, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees. **ON BRIEF:**  Paul B. Lewis, DLA PIPER LLP (US), Boston, Massachusetts, Julie A. Gryce, DLA PIPER LLP (US), San Diego, California, Daniel Turinsky, Jonathan M. Kinney, DLA PIPER LLP (US), New York, New York, Jay R. Langenbahn, LINDHORST & DREIDAME, CO., L.P.A., Cincinnati, Ohio, Eric Thompson Ira Lustbader, Stephanie Persson, CHILDREN'S RIGHTS, New York, New York, Richard F. Dawahare, RICHARD F. DAWAHARE, ESQ., Lexington, Kentucky, for Appellants. Mathura J. Sridharan, Benjamin M. Flowers, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees. Guenther Karl Fanter, BAKER & HOSTETLER LLP, Cleveland, Ohio, Susan Baker Manning, MORGAN LEWIS & BOCKIUS LLP, Washington, D.C., for Amici Curiae.

          NALBANDIAN, J., delivered the opinion of the court in which McKEAGUE, J., joined. READLER, J. (pp. 14–21), delivered a separate opinion concurring in part and in the judgment.

———————————

**OPINION**

———————————

NALBANDIAN, Circuit Judge.    Child foster care systems in this country are administered by the various state governments.    The federal government, however, will reimburse states, like Ohio, for "foster care maintenance payments" that the state makes to certified foster caregivers who meet federal-eligibility requirements.    In Ohio, there are also foster caregivers whom the state does not certify as meeting those federal requirements.  So Ohio withholds payments for those caregivers.  Instead, Ohio provides these non-certified caregivers with less generous payments through a separate state program.  The plaintiffs here are a group of foster caregivers whom Ohio has considered ineligible to receive the higher foster care maintenance payments but who argue that they meet the federal requirements and are thus entitled to those payments.  So they have sued Ohio Governor Mike DeWine and the Director of the Ohio Department of Job and Family Services.

The district court dismissed the Plaintiffs' claims, finding that the Plaintiff caregivers do not have to meet the same licensing standards as licensed caregivers in Ohio and thus were not "foster family homes" as required by federal law.  Because Title IV-E of the Social Security Act requires that all foster family homes eligible for payments under federal law meet the same licensing standards, we agree with the district court that the Plaintiffs are not eligible to receive the foster care maintenance payments and affirm.

I.

A.  Title IV-E

By enacting the Adoption Assistance and Child Welfare Act of 1980 ("CWA"), Congress used its Spending Clause powers to create Title IV-E of the Social Security Act and set up a statutory scheme for states to administer foster care systems.  Title IV-E lays out requirements for states that receive federal funds, such as having a state plan approved by the Secretary of the Department of Health and Human Services ("HHS").  Ohio receives Title IV-E funds and

has a state plan approved by the HHS.  *See H.C. v. Governor of Ohio*, No. 1:20-cv-00944, 2021 WL 3207904, at *4 (S.D. Ohio July 29, 2021).

Like other Spending Clause legislation, Title IV-E's federal money has strings attached. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 323 (2015).  Along with Ohio's state plan conforming with the other requirements set out in 42 U.S.C. § 671(a), Ohio must provide foster care maintenance payments ("FCMPs") to eligible children and their caregivers. *See* 42 U.S.C. § 671(a)(1).

Like other states, Ohio claims reimbursements under Title IV-E for FCMPs made to eligible recipients.  Congress set out eligibility requirements in Title IV-E, *see id.* § 672, and HHS has offered regulatory guidance, *see generally* 45 C.F.R. §§ 1355, 1356.  Relevant here, for a child to be eligible to receive FCMP's, the child must be "placed in a foster family home." 42 U.S.C. § 672(a)(2)(C).  Title IV-E defines a "foster family home" as a home:

> (i) that is licensed or approved by the State in which it is situated as a foster family home that meets the standards established for the licensing or approval; and (ii) in which a child in foster care has been placed in the care of an individual, who resides with the child and who has been licensed or approved by the State to be a foster parent[.]

*Id.* § 672(c)(1)(A).  States with approved plans "shall" make FCMPs to eligible children.  *Id.* § 672(a)(1).

State plans must also maintain licensing standards for foster family homes "reasonably in accord with recommended standards of national organizations," and these standards must apply to the homes of children receiving FCMPs.  *Id.* § 671(a)(10)(A)–(B).  Importantly, the state plan sets forth the specific criteria that the state is going to apply in order to determine FCMP eligibility.  This set of criteria is then approved by HHS as part of the state-plan approval and future reviews.  *See* 45 C.F.R. § 1356.71(d).

## B.  Foster Care in Ohio

Ohio has two foster care systems.  One is Ohio's Title IV-E program, operated in accordance with Ohio's state plan approved by the HHS Secretary.  *See generally* Ohio Rev. Code § 5101; Ohio Admin. Code 5101:2-47.  Caregivers eligible for this program become

"certified" by the state, which means they are "licensed" caregivers under Title IV-E. Ohio Rev. Code § 5103.03(B)(2). The other program is a separate, state-run foster-care system for non-certified foster caregivers who are deemed ineligible to participate in Title IV-E. *See* Ohio Admin. Code 5101:2-42-18.

The Ohio Department of Job and Family Services ("ODJFS" or "Department") administers both systems. For Title IV-E purposes, the Department regulates the licensing of foster care homes and issues "certificates" to foster homes that it concludes meet Title IV-E's requirements. *See* Ohio Rev. Code § 5103.03(B)(2). Not every caregiver's home meets those requirements. For instance, while Title IV-E allows waivers for some standards for foster family homes, it specifically prohibits waivers for safety standards. 42 U.S.C. § 671(a)(10)(D). But at the same time, Title IV-E contains a "preference" for placing children with relatives. *See id.* § 671(a)(19). As a result, Ohio runs its state foster care system for non-certified foster caregivers to provide an avenue for children to be placed with relatives. In effect, Ohio operates this separate system to place children with relatives who are not already certified caregivers (and thus ineligible for FCMPs), and pays them to care for the children, albeit less than the FCMPs.

The Department promulgates rules to administer the state system. *See* Ohio Rev. Code § 5101.881. Before December 2020, all non-certified caregivers were eligible for financial assistance from Ohio Works First (the financial assistance portion of Ohio's Temporary Assistance for Needy Families program) or from other public-benefits programs. *See* Ohio Admin. Code 5101:2-42-18(B)(8)(b). During this litigation, the Ohio legislature passed, and Governor Mike DeWine signed into law, Amended Substitute Senate Bill 310. The bill, which went into effect the same day, created the Kinship Support Program ("KSP"). *See* Ohio Rev. Code § 5101.881. The KSP provides financial assistance to non-certified relative caregivers who receive temporary or permanent custody of children in the foster care system but are not certified by the state as foster care homes under Title IV-E. *See id.* §§ 5101.884, 5103.03.

Under the KSP, non-certified caregivers are subject to different standards than certified caregivers eligible for FCMPs. *See H.C.*, 2021 WL 3207904, at *12 (comparing standards). In turn, these non-certified caregivers in the state system receive a per diem less than the amount licensed caregivers receive from FCMPs. *Compare* Ohio Rev. Code § 5101.885, *with* Ohio

Admin. Code § 5101:2-47-19.  But Ohio encourages non-certified caregivers to get certified as a licensed foster family home.  If a caregiver fails to obtain certification within six or nine months, the payments end.  *See* Ohio Rev. Code § 5101.886.  Likewise, if a caregiver receives a certificate, KSP payments also cease and FCMPs begin.  *See id.* §§ 5101.887, 5101.889.

## C.  Procedural History

The Plaintiffs here are four foster children and four of their relative foster caregivers. The caregivers brought a putative class action against Governor DeWine and the then-director of ODJFS, in their official capacities.[1]  The Plaintiffs alleged that the Defendants, acting under color of state law, are depriving the Plaintiffs of their statutory rights to FCMPs under 42 U.S.C. § 672(a), in violation of 42 U.S.C. § 1983.  They sought declaratory and injunctive relief.[2]

The Plaintiffs moved to certify their classes and for a preliminary injunction.  Ohio opposed the motions and moved to dismiss the case.  The district court granted the motions to dismiss and denied as moot the motions for class certification and a preliminary injunction. *H.C.*, 2021 WL 3207904, at *14.  The district court determined that Governor DeWine was immune from suit under the Eleventh Amendment, *see id.* at *8, a ruling the Plaintiffs don't challenge on appeal.  But the district court ruled that the ODJFS Director was not entitled to sovereign immunity because the suit fell within the *Ex parte Young* exception.  *See id.* at *7 (citing *Ex parte Young*, 209 U.S. 123 (1908)).  On the merits, the district court concluded that there is a single set of federal eligibility requirements under Title IV-E for caregivers in Ohio to qualify for FCMPs.  And because the Plaintiffs did not meet the same federally-approved standards that Ohio has for licensed caregivers, they are not "approved" foster family homes under Title IV-E and are ineligible for FCMPs.  *Id.* at *13.  The Plaintiffs timely appealed.

---

[1]Matthew Damschroder is now the ODJFS Director and thus a Defendant in this suit.

[2]We note that the Supreme Court recently granted certiorari in a case asking the Court to reexamine its holding that individuals can bring suit under 42 U.S.C. § 1983 to enforce rights under Spending Clause legislation. *See Talevski v. Health & Hosp. Corp. of Marion Cnty.*, 6 F.4th 713 (7th Cir. 2021), *cert. granted*, 142 S. Ct. 2673 (May 2, 2022) (No. 21-806).

II.

"Every federal appellate court has a special obligation to assure itself . . . of its own jurisdiction[.]" *Mays v. LaRose*, 951 F.3d 775, 781 (6th Cir. 2020) (quoting *Alston v. Advanced Brands & Importing Co.*, 494 F.3d 562, 564 (6th Cir. 2007)).   Because the Department challenges the district court's sovereign-immunity determination, we first must address this jurisdictional issue.**3**   *See Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015) (determining that "the Eleventh Amendment is a true jurisdictional bar" that "once raised as a jurisdictional defect, must be decided before the merits"); *see also Doe v. DeWine*, 910 F.3d 842, 848 (6th Cir. 2018).

Since the Plaintiffs do not challenge the district court's finding that Governor DeWine was entitled to sovereign immunity, we review only the district court's ruling as to Director Damschroder.   And we review de novo whether a state official is entitled to sovereign immunity. *See Price v. Medicaid Dir.*, 838 F.3d 739, 746 (6th Cir. 2016).

By and large, the Eleventh Amendment protects States from private civil suits, both from their own citizens and citizens of other States.   *See* U.S. Const. amend. XI; *Lapides v. Bd. of Regents*, 535 U.S. 613, 616 (2002).   Suits against state officials in their official capacity, like this one, are no different than suits against the State itself.   *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).   Over time, courts have recognized three exceptions to sovereign immunity.   First, States may consent to suit, but neither Ohio nor its officials have done so here.   Second, Congress may abrogate sovereign immunity by statute, but it did not do so with 42 U.S.C. § 1983.   *See Ladd v. Marchbanks*, 971 F.3d 574, 578 (6th Cir. 2020).   And last, federal courts have jurisdiction to enjoin state officials from ongoing unlawful conduct.   *See Ex parte Young*, 209 U.S. at 159.

---

**3**The Department argues that two of the named Plaintiffs' claims are now moot.   True, in general we are without jurisdiction to hear a case in which the plaintiff no longer has a personal stake in the outcome of the litigation.   *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160–61 (2016).   But where, as here, at least one plaintiff remains with a justiciable claim, we need not settle the mootness question before the merits.   *See Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 278 n.4 (6th Cir. 1997); *cf. Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n. 2 (2006).   And like the district court, because we hold that *all* of the Plaintiffs failed to state a claim, we need not answer the mootness question.   *See H.C.*, 2021 WL 3207904, at *14 n.15.

To determine whether the *Ex parte Young* exception applies, we "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (alteration in original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)).  Retroactive relief for past unlawful conduct will not do. *See Edelman v. Jordan*, 415 U.S. 651, 664, 678 (1974).

Here, the Plaintiffs want to enjoin Ohio officials from withholding FCMPs in an alleged ongoing violation of federal law.  The injunction's effect would be that Ohio officials would issue FCMPs to these Plaintiffs and others like them going forward.  Although this relief would have "a direct and substantial impact on the state treasury," *Milliken v. Bradley*, 433 U.S. 267, 289 (1977) (citing *Edelman*, 415 U.S. at 667), we have held that similar relief falls within the *Ex parte Young* exception, *see Price*, 838 F.3d at 747.  "[I]n suits concerning a state's payment of public benefits under federal law, a federal court may enjoin the state's officers to comply with federal law by awarding those benefits in a certain way going forward—even if the court may not order those officers to pay out public benefits wrongly withheld in the past." *Id.*  That is the kind of relief that the Plaintiffs seek here.

The Department cites several cases in response that apply Eleventh Amendment immunity.  But those cases address particularized situations involving a blurry line between retroactive and prospective violations of law.  And none of them concerned a state's payment of public benefits under federal law like *Price* does. *See Ernst v. Rising*, 427 F.3d 351, 370–71 (6th Cir. 2005) (en banc) (state judges requesting an increase in pension benefits without paying additional contributions); *Barton v. Summers*, 293 F.3d 944, 949–50 (6th Cir. 2002) (plaintiffs requesting present entitlement to payments from a future Tobacco Master Settlement); *Kelley v. Metro. Cnty. Bd. of Educ. of Nashville*, 836 F.2d 986, 987–92 (6th Cir. 1987) (school district seeking expenses from Tennessee for the cost of desegregating).  Perhaps tellingly, the Department does not cite *Price* in its briefing.

In the end, *Price* is the case closest to this one, and the Department has not convinced us that *Price* does not control here.  The Plaintiffs' suit seeks prospective relief to end an allegedly

ongoing violation of federal law, and thus falls within the *Ex parte Young* exception as we've construed it.

## III.

Turning now to the merits, the Plaintiffs argue that the district court erred in concluding that because the Plaintiff caregivers are not "approved" under § 672, they are not "licensed or approved" "foster care homes" under Title IV-E and thus not eligible for FCMPs. *H.C.*, 2021 WL 3207904, at \*13. We review the district court's dismissal for failure to state a claim de novo. *See Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 692 (6th Cir. 2022). And we review questions of statutory interpretation de novo as well. *See Spurr v. Pope*, 936 F.3d 478, 485–86 (6th Cir. 2019).

## A.

This case boils down to whether the district court properly interpreted the meaning of "foster family home" under § 672(c)(1)(A). To interpret a statute, we start with the text. When "the text is clear, that is the end of the matter." *Keen v. Helson*, 930 F.3d 799, 805 (6th Cir. 2019).

Section 672 sets out the eligibility requirements for FCMPs. Among other things, states like Ohio with approved plans must make FCMPs to children "placed in a foster family home." 42 U.S.C. § 672(a)(2)(C). Title IV-E, in turn, defines a foster family home as one "that is licensed or approved by the State . . . that meets the standards established for the licensing or approval." *Id.* § 672(c)(1)(A)(i). Plaintiffs contend that they are "approved" though not "licensed" by Ohio under the separate state program and that this "approval" satisfies Title IV-E.

We disagree. Congress made clear that the same standards apply to every foster family home; it did not create two separate standards (i.e., one set of licensing standards and one set of approval standards) that would both be sufficient for FCMP eligibility. The particular standards that Congress set out and that the states implement—safety, admission policies, sanitation, and protection of civil rights—"shall be applied by the State to *any* foster family home . . . receiving funds." *Id.* § 671(a)(10)(A)–(B) (emphasis added). Although undefined in § 671, "any" means

"all" when read with the rest of the statute. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting *Webster's Third New International Dictionary*) ("Read naturally, the word 'any' has an expansive meaning" so "any other term of imprisonment" means "all terms of imprisonment."). So once HHS approves the standards that the state develops for its FCMP licensing program, these standards apply to all foster family homes, whether they are deemed "licensed or approved." Reading that statutory language together, then, the district court was correct in finding that "an 'approved' relative caregiver is not eligible for [FCMPs] under Title IV-E unless the state 'approval' standards are the same standards that the state uses for licensing foster caregivers." *H.C.*, 2021 WL 3207904, at *13.

There is no dispute that Ohio has different standards for certified caregivers and for approved caregivers. *See* Ohio Admin. Code. 5101:2-42-18(B)(8)(e) ("The requirements for foster caregiver certification . . . differ from the requirements for approval as a relative or nonrelative substitute caregiver."). The district court comprehensively spelled out the differences between the two.

> For example, there are fewer disqualifying criminal offenses for unlicensed relative caregivers than for licensed foster homes. *Compare* Ohio Admin. Code § 5101:2-42-18(B)(11)-(12), *with* Ohio Admin. Code 5101:2-7-02(J), appendix A. Moreover, although both types of foster care providers are subject to a criminal background check, the background check standards vary. *Compare* Ohio Admin. Code § 5101:2-42-18(B)(12), *with* Ohio Admin. Code § 5101:2-7-02(K), (M)-(O). Additionally, approval of placement with a relative caregiver does not require the same safety and training standards as licensure as a foster caregiver. *Compare* Ohio Admin. Code § 5101:2-7-02(Y) (requiring 36 hours of pre-placement training for licensed homes and additional trainings after licensure), *with* Ohio Admin. Code § 5101:2-42-18(B) (no trainings required). As a final example, licensure as a foster caregiver requires the submission of information regarding the applicant foster caregivers' physical, emotional, and mental health whereas approval as relative caregiver does not require prospective caregivers to submit such health information. *Compare* Ohio Admin. Code § 5101:2-7-02, *with* Ohio Admin. Code § 5101:2-42-18(B). Additionally, Ohio Administrative Code § 5101:2-42-18 provides that "[t]he requirements for foster caregiver certification [*i.e.*, licensure] approval...differ from the requirements for approval as a relative or nonrelative substitute caregiver." *Id.* § 5101:2-42-18(B)(8)(e).

*H.C.*, 2021 WL 3207904, at \*12. So by having different standards, Ohio's system creates a group of caregivers eligible for FCMPs and an ineligible group. The district court was thus correct that the Plaintiffs, who are not "foster family homes" under Title IV-E, are ineligible for FCMPS and failed to state a claim. *Id.* at \*13.

The Plaintiffs do not argue that they are Ohio "licensed" foster caregivers, but object to the district court's interpretation of the statute. In particular, they argue that § 672(a)'s use of the disjunctive "or" means that Congress intended for two separate classes of caregivers to qualify as foster family homes under Title IV-E—those that are "licensed" and those that are "approved." And because Ohio "approved" them as foster caregivers, the Plaintiffs argue that Ohio should be making FCMPs to them. To hold otherwise, the argument goes, would be to read "or" out of the statute, rendering it superfluous.

True, the plain meaning of "or" is usually meant in the disjunctive. *See United States v. Chriswell*, 401 F.3d 459, 470 (6th Cir. 2005). But using the terms "licensed" and "approved" for foster families does not mean we treat the licensing standards as distinct. On the contrary, the statute is best read as "contemplat[ing] two categories of foster families," *D.O. v. Glisson*, 847 F.3d 374, 382 (6th Cir. 2017), while also requiring uniformity in licensing standards. Put another way, the two categories of foster families are those eligible for FCMPs and those who are not. Any foster family wishing to be in the eligible category must meet the state's Title IV-E licensing standards.

Congress had good reason to use a belt-and-suspenders approach by including what states might call "licensed" and "approved" foster family homes. Doing so gives states more flexibility to implement Title IV-E while also advancing goals such as safety and placing children with relative caregivers. Importantly, the states use terminology beyond "license" and "approve." Ohio, for example, uses "certify" rather than "license." *See* Ohio Rev. Code §§ 5103.03(B)(2), 5103.031. So "approve" is best read as a catch-all for states that use different terminology, but that doesn't change the fact that the same standards must be met to qualify for FCMPs. What counts is who satisfies the HHS-approved state eligibility requirements, not the state nomenclature.

More than that, Ohio is not alone in operating a foster-care system for children outside of Title IV-E's reach.  And of course Congress knew this; the CWA did not invent foster care or "displace preexisting foster care systems but merely created a mechanism for partial reimbursement of a specified set of expenses associated with some children."  *N.Y. State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 88 (2d Cir. 2019) (Livingston, J., dissenting); *see also Glisson*, 847 F.3d at 376 ("This federal-state grant program facilitates state-run foster care and adoption assistance for children removed from low-incomes homes.").  So even though the Plaintiffs argue that this reading of § 672 is superfluous, their reading is a significantly greater departure from the system that Congress set up in Title IV-E overall.  Usurping a preexisting web of state systems with a federal one that provides partial reimbursements would get less resources to children in need, not more.

In the end, the Plaintiffs overstate their surplusage argument, and their reading of the text falls flat.  After all, "[r]edundancy is not a silver bullet."  *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019).  "The canon against surplusage is not an absolute rule," and Congress may "include[] it to remove doubt."  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

The Plaintiffs run into another stiff headwind with their reading of § 672 when it comes to regulatory language.  HHS, the federal agency Congress tasked with administering Title IV-E, directly contradicts the Plaintiffs' reading (while supporting ours and the district court's).  "Foster family homes that are approved must be held *to the same standards* as foster family homes that are licensed.  Anything less than full licensure or approval is insufficient for meeting [T]itle IV-E eligibility requirements."  45 C.F.R. § 1355.20(a) (emphasis added).  And beyond regulation, in response to a request for its views in a similar case, HHS told us directly that caregivers who are held to a different standard than licensed foster family homes are ineligible for FCMPs.  *See J.B-K. v. Sec. of Ky. Cabinet for Health & Fam. Servs.*, --- F.4th ---, No. 21-5074, 2022 WL 4282665, at *6 (6th Cir. Sept. 16, 2022) (citing Brief for the United States as Amicus Curiae, *J.B-K. v. Sec. of Ky. Cabinet for Health & Fam. Servs.*, No. 21-5074, at 6 (6th Cir. Apr. 8, 2022)).  As explained above, the Plaintiffs here were not held to Ohio's certification standards and thus are ineligible for FCMPs.  *See id.* at *5–6.  So although the text

here is clear and we need not defer to HHS, their interpretation reinforces what our interpretative tools tell us. *See id*. at *6 (citing *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1906 (2022)).

B.

The Plaintiffs argue that our decision in *Glisson* means that Ohio is withholding FCMPs to relative caregivers solely because they are relatives. That would, of course, violate federal law. *See Glisson*, 847 F.3d at 383; *see also Miller v. Youakim*, 440 U.S. 125, 135 (1979). But that is both a misreading of *Glisson* and a mischaracterization of Ohio's foster-care system.

In *Glisson*, the plaintiff was an aunt caring for relative children. Kentucky denied her FCMPs even though she had met Kentucky's safety standards, including a background check and home evaluation. 847 F.3d at 383. But after acknowledging that states may waive non-safety standards, we reasoned that the caregiver had met those standards. *Id.* So we concluded that "if Kentucky [wa]s denying benefits because the aunt is related to the children, it is violating federal law." *Id.* at 384. We then remanded so the district court could determine other eligibility requirements. *Id.* In sum, *Glisson* did not hold that states may not operate two foster-care systems with different standards, just that states cannot determine Title IV-E eligibility on relation alone.

Ohio does not withhold FCMPs because a caregiver is related to a child. Recognizing "Congress's preference for care of dependent children by relatives," *Miller*, 440 U.S. at 141, Ohio's foster system is structured to initially place children with non-certified relatives, while contemplating that those relative caregivers could become eligible for FCMPs later, *see* Ohio Admin. Code 5101:2-42-18(B)(8)(c)–(f). Non-certified relative caregivers can apply for certification in Ohio and Ohio encourages them to do so. Ohio's bifurcated system is set up with the understanding that many relatives are not immediately ready to be certified under ODJFS's standards when duty calls. But the KSP aims to keep children with relatives by providing temporary funding to relative caregivers and then encouraging them to become certified.

IV.

The district court properly interpreted § 672 in finding that caregivers like the Plaintiffs, who are subject to different standards than "licensed" caregivers are not "foster family homes," are ineligible to receive FCMPs.  We affirm.

———————————

**CONCURRENCE**

———————————

CHAD A. READLER, Circuit Judge, concurring in part and concurring in the judgment. For the reasons explained in the thoughtful majority opinion, this is a straightforward case on the merits of plaintiffs' claims. I concur in that part of the opinion. But in view of Director Damschroder's assertion of sovereign immunity, whether we have jurisdiction to resolve those claims is less clear-cut. A few words why I believe that to be the case.

Start with a well settled background principle: over the life of our republic, state sovereignty has played a foundational role in preserving our federal system of government. In most respects, the 50 states in our constitutional federation enjoy the authority to govern their own affairs without interference from the national government. That is a longstanding truth, tracing back to our founding. *See, e.g.*, The Federalist No. 39, at 245 (James Madison) (C. Rossiter ed., 1961) (describing the well understood "inviolable sovereignty" of the states). So when the states joined the federal system by ratifying that Constitution, they did so "with their sovereignty intact." *PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2258 (2021) (cleaned up); *see also Torres v. Tex. Dep't of Pub. Safety*, 142 S. Ct. 2455, 2461 (2022).

One "'integral component' of the States' sovereignty" is their "immunity from private suits." *Franchise Tax Bd. v. Hyatt*, 139 S. Ct. 1485, 1493 (2019) (quoting *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 751–52 (2002)). Sovereign immunity traces back to English common law, the foundation for our legal system. Caleb Nelson*, Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 Harv. L. Rev. 1559, 1568–74 (2002). At the time of the founding, a court's jurisdiction depended upon having the power to require an appearance by the defendant. *Id.* This power came from either consent or command. *Id.* at 1574. Because a sovereign could not be commanded into court, a court was unable to entertain suits against a sovereign without its consent. William Baude & Stephen E. Sachs, *The Misunderstood Eleventh Amendment*, 169 U. Pa. L. Rev. 609, 616 (2021).

Drawing from this history, sovereign immunity was a point of emphasis for the Framers in constructing our federal system of government. *See* 3 Debates on the Adoption of the Federal Constitution 555 (John Marshall) (J. Elliot ed., 1854) (contending that it would not be "rational to suppose that [a state in exercising] sovereign power should be dragged before a court"); *id.* at 533 (James Madison) ("Its jurisdiction in controversies between a state and citizens of another state is much objected to, and perhaps without reason. It is not in the power of individuals to call any state into court."); The Federalist No. 81, at 548–49 (Alexander Hamilton) (J. Cooke ed., 1961) ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." (emphasis removed)). Ratification of the Constitution cemented the concept into law. *See Alden v. Maine*, 527 U.S. 706, 713–14 (1999) ("[T]he Constitution's structure, its history, and the authoritative interpretations by [the Supreme] Court make clear [that] States' immunity from suit [was] a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today. . . ."). After some initial uncertainty over the scope of that immunity, *see Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793), state sovereign immunity was further entrenched in our federal structure by the enactment of the Eleventh Amendment. *See, e.g.*, *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021) ("Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity."); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). And to avoid an otherwise apparent end run, that immunity applies to suits against state actors in their official capacities; those suits are treated as actions against the state itself. *Jackson*, 142 S. Ct. at 532.

The immunity aspect of federalism is meant to "preserv[e] the States' ability to govern in accordance with the will of their citizens." *Fed. Mar. Comm'n*, 535 U.S. at 765 (cleaned up). That includes, perhaps most notably, a state's control of its purse. Indeed, the infringement on the right to self-government is at its apex when a federal court is asked to award a plaintiff relief that implicates a core state interest like a state's management of its treasury. *Edelman v. Jordan*, 415 U.S. 651, 673–75 (1974). In simplest terms, when someone else is controlling your checkbook, it is hard to feel much independence.

Over time, judicially crafted exceptions began to chip away at a state's immunity from suit. *Torres*, 142 S. Ct. at 2462; *Jackson*, 142 S. Ct. at 532. Arguably the most critical of those is the one the Supreme Court recognized more than a century ago in *Ex parte Young*, 209 U.S. 123 (1908). *Ex parte Young* held that federal courts may exercise jurisdiction to enjoin violations of federal law by a state official. *Id.* at 159; *see also Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013). In such cases, the logic goes, the lawsuit is no longer "against the state" in that a defendant's purportedly unlawful actions are stripped of their official character. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984).

To guard against the exception swallowing the rule, the scope of a federal court's remedial power under *Ex parte Young* is confined. Here are a few examples of how *Ex parte Young* plays out in practice. In view of a state's deep interest in protecting control of its purse, a federal court generally may not award retroactive relief that "requires the payment of funds from the state treasury." *Edelman*, 415 U.S. at 677 (1974). Yet a court may require the state official to cease his unlawful conduct when a "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). But to be "properly characterized as prospective," any monetary demand on the state treasury that results from an injunction issued under *Ex parte Young* must be "ancillary" to some other form of prospective relief. *Edelman*, 415 U.S. at 668. Otherwise, the relief sought sails perilously close to being a damages suit directly against the state. *Green v. Mansour*, 474 U.S. 64, 73 (1985) (rejecting a prospective monetary injunction that was not ancillary to any other legitimate form of relief because it would have had "the same effect as a full-fledged award of damages").

What we have here is a request for relief that runs up against the limits we face in awarding prospective relief under *Ex parte Young*. All agree that plaintiffs seek a prospective remedy only: enjoin Director Damschroder from "failing or refusing to make . . . Foster Care Maintenance Payments" going forward. Yet their requested injunction would compel Ohio officials to make those payments out of the state treasury. That raises the question: are plaintiffs' claims against Director Damschroder properly characterized as permissible prospective relief?

Our prior cases, admittedly, send mixed signals. Begin with the one featured in the majority opinion—*Price v. Medicaid Dir.*, 838 F.3d 739 (6th Cir. 2016). The plaintiffs there alleged that Ohio was violating federal law by refusing to offer Medicaid coverage for assisted living services procured before the beneficiary was deemed eligible for coverage. *Id.* at 744. The district court agreed and enjoined state officials from denying Medicaid coverage for those services going forward. *Id.* at 747. We upheld the injunction on the basis that "a federal court may enjoin the state's officers to comply with federal law by awarding those benefits in a certain way going forward—even if the court may not order those officers to pay out public benefits wrongly withheld in the past." *Id.* The logic of *Price* suggests that so long as the relief sought enjoins a state's future conduct, we need not consider the fiscal effects of the injunction.

But there is friction between *Price* and a trilogy of earlier cases. One is *Kelley v. Metro. Cnty. Bd. of Educ. of Nashville*, 836 F.2d 986 (6th Cir. 1987). *Kelley* arose out of a then decades-old desegregation order applicable to a Tennessee school district. The district believed that the state should cover the district's future desegregation-related costs. So it asked a federal court to enjoin the state's education officers in a way that compelled the relief the plaintiff sought. *Id.* at 987. But that result, we explained, was barred by the Eleventh Amendment. To our minds, the *Ex parte Young* exception for prospective injunctions applies only when a state official is "about to commence proceedings to enforce an unconstitutional act." *Id.* at 990 (cleaned up). The disbursement of state funds, on the other hand, is not an enforcement action, meaning the injunction at bottom was about access to the state's treasury. *Id.* That was so, we emphasized, even where the "compensatory interest was being satisfied only prospectively." *Id.* at 991 (cleaned up).

Much to the same end is *Sutton v. Evans*, 918 F.2d 654 (6th Cir. 1990). That case too centered on an aspect of Tennessee's public education system. In district court, the plaintiffs secured an injunction requiring the Tennessee Department of Education to compensate employees being transferred to new positions while litigation regarding their transfer was ongoing. In reviewing that injunction, our focus, once again, was on the substance of the relief rather than its timing. Because the injunction would have a "substantial effect on the state's budget," we explained, it is impermissible under the Eleventh Amendment unless the budgetary

effect was "'ancillary' to some other form of prospective relief." *Id.* at 658 (cleaned up). And as an order to pay supplemental compensation was—like today's requested relief—ancillary to nothing, we vacated the injunction. *Id.*

Finally, consider our en banc decision in *Ernst v. Rising*, 427 F.3d 351 (6th Cir. 2005) (en banc). There, a group of retired Michigan state court judges alleged that Michigan's judicial retirement scheme favored other retired judges in ways that violated the Equal Protection Clause. On that basis, the plaintiff judges sought an injunction that would have ordered Michigan state officials to increase their benefits. The district court denied the request, and we affirmed. *Id.* at 372–73. As in *Kelley* and *Sutton*, the requested injunction, to our eye, sought "*nothing more* than future monetary payments," which amounted to a "direct monetary award." *Id.* at 370 (emphasis in original). That being the case, the action was precluded by Michigan's sovereign immunity. *Id.* at 371.

From the common refrain this precedential trio sings, one could fairly conclude that Director Damschroder is entitled to sovereign immunity. Together, these cases emphasize that prospective relief does not satisfy the *Ex parte Young* exception where it is tantamount to a direct claim on a state's treasury. *See Milliken v. Bradley*, 433 U.S. 267, 288–90 (1977). Rather, the plaintiff's injury must be vindicated through non-monetary means; any expenditure of state funds, remember, must be "ancillary, *i.e.*, not the primary purpose of the suit." *Barton v. Summers*, 293 F.3d 944, 950 (6th Cir. 2002); *see also Cardenas v. Anzai*, 311 F.3d 929, 940–41 (9th Cir. 2002) (O'Scannlain, J., concurring) (affirming *Barton*'s construction of the "ancillary" requirement).

*Price*, I acknowledge, seemingly reached the opposite conclusion. As *Price* did not flesh out how to reconcile the arguable tension that it left in our precedent, we have many paths forward. One is the path followed by the majority opinion: read *Price* as the case most analogous to this one. If so, we are bound to follow it. *See United States v. McKinnie*, 24 F.4th 583, 589 (6th Cir. 2022) (quoting *United States v. Ferguson*, 868 F.3d 514, 515 (6th Cir. 2017)) ("One panel of this court may not overrule the decision of another panel.").

But a better case can be made for following the rule articulated in *Kelley*, *Sutton*, and *Ernst*. That framework turns more on the substance of plaintiffs' requested relief than its timing. It asks "whether the money or the non-monetary injunction is the primary thrust of the suit." *Barton*, 293 F.3d at 949. That approach, to my mind, better honors the principles underlying sovereign immunity. Few interests, after all, are more central to a state's sovereignty than control over the public fisc. *See id.* at 951 ("[A]n attempt to force the allocation of state funds implicates core sovereign interests."). By and large, a state raises those monies from its residents through taxes and other means. Once it does, it decides how to allocate those dollars, a skill most public officials are not shy about exercising. Because those spending demands almost always exceed budgetary supply, state officials are left to make difficult fiscal and policy decisions: who receives state allocations, and in what amounts? In these respects, "[s]tate treasury liability" is "one of the most essential factors in the sovereign immunity inquiry." *Ernst*, 427 F.3d at 371.

So it is no surprise that we zealously guard against granting a plaintiff an injunction whose main target is a state's fisc. Of course, few injunctions expressly impose monetary relief against a state. That being the case, we police injunctions for their actual impact on a state's coffers. At bottom, awarding relief that in practice amounts to little more than a payment out of the state treasury is tantamount to a federal court entering a monetary judgment against the state. *Cf. Edelman*, 415 U.S. at 665 (explaining that, where the "funds to satisfy the award . . . must inevitably come from the general revenues of the State[,] . . . the award resembles far more closely the monetary award against the State itself"). We do not have jurisdiction to do so. *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256–57 (2011) ("*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury.").

Focusing simply on whether the relief sought is retrospective or prospective, as plaintiffs read *Price* to say, has a forest and trees feel to it. True, when a plaintiff files an action seeking payment from the state for a debt not yet due, that makes the claim nominally prospective. *See Kelley*, 836 F.2d at 991. But a prospective monetary award, which may have no natural end, could have a far greater impact on a state treasury than a one-time retrospective damages award. That makes the distinction between prospective and retrospective relief artificial at best. *See*

*Hutto v. Finney*, 437 U.S. 678, 690 (1978) (quoting *Edelman*, 415 U.S. at 667) ("[T]he difference between retroactive and prospective relief 'will not in many instances be that between day and night.'").

Permitting monetary injunctions simply because they are prospective in nature presents practical concerns too. It does not take an especially creative lawyer to dress up a monetary claim in equitable clothing. *See Barton*, 293 F.3d at 949 (rejecting a damages claim "couched . . . in prospective language"). Take this case as an example. Plaintiffs contend that Ohio misreads federal law. And because, plaintiffs allege, Ohio has been wrongly administering a federal benefits program, an order requiring Ohio to properly administer that program would be appropriate under *Ex parte Young*, they say, even if doing so would implicate the state fisc. *See* Maj. Op. at 7 (citing *Price*, 838 F.3d at 747). Yet plaintiffs do not ask for an order forcing Ohio to come into compliance with their reading of federal law. Rather, they make an inflexible demand for money: enjoin the state from "failing or refusing to make . . . Foster Care Maintenance Payments." The relief they seek, in other words, is simply damages by another name. *Hutto*, 437 U.S. at 708 (Powell, J., concurring) ("In the case of a purely prospective decree, budgeting can take account of the expenditures entailed in compliance, and the State retains some flexibility in implementing the decree, which may reduce the impact on the state fisc."). *Ex parte Young* does not shield that request from Director Damschroder's invocation of sovereign immunity.

Does this mean plaintiffs are completely without recourse? Not necessarily. As now-Chief Judge Sutton observed in *Ernst*, plaintiffs in these circumstances could adjust their complaint to request something other than direct monetary relief. For example, plaintiffs could "ask the court to equalize treatment by *diminishing* the benefits to" other families, *Ernst*, 427 F.3d at 369 (emphasis in original), assuming there are no statutory or regulatory issues with such an order. Or they could request an injunction that simply orders the state to provide "equal . . . benefits [and] leave[] it to the State to determine how to equalize treatment on a going-forward basis." *Id.* at 370.

One could also imagine an injunction requiring the state to "certif[y]" the plaintiffs as Title IV-E compliant foster homes, *see* Ohio Rev. Code § 5103.03(B)(2), making them eligible

for foster care maintenance payments.  But, again, that is not what plaintiffs asked for.  Their challenge is not about their status as foster families, or any other analytically distinct claim.  It is a request that Ohio be enjoined from "failing or refusing to make . . . Foster Care Maintenance Payments."  By their own admission, plaintiffs' pursuit is money alone.

*        *        *        *        *

The majority opinion reads *Price* as the decisive case in resolving this dispute.  That may be right as a precedential matter.  But it strikes me as debatable at best as an original one.  At the very least, our prior cases have not been of one mind.  Perhaps a future case will present our en banc Court or the Supreme Court with the opportunity to clarify when state sovereign immunity forecloses a request for prospective monetary relief.  As this case reflects, there is reason to do so.  But for today's purpose, because, as the majority opinion rightly concludes, plaintiffs' claims are not meritorious, I concur in the judgment.